1

2

3

4

5

6

7

8                    IN THE UNITED STATES DISTRICT COURT

9                   FOR THE EASTERN DISTRICT OF CALIFORNIA

10   JOHN ZAPATA dba ZAPATA
     COLLECTION, SERVICE,
11   an Individual,

12              Plaintiff,                    No. 2:09-cv-03555 GEB KJN PS

13        v.

14   FLINTCO, INC., an Oklahoma
     corporation, SAN JOAGUIN [*sic*]
15   COMMUNITY COLLEGE DISTRICT,
     a Political Subdivision and JOHN DOE
16   1-25, inclusive,

17              Defendants.               FINDINGS AND RECOMMENDATIONS

18   _____/

19              Presently before the court is defendants' motion to dismiss this case for lack of

20   federal subject matter jurisdiction.[1]  (Mot. to Dismiss, Dkt. No. 41.)  Briefly stated, defendants

21   seek dismissal on the grounds that: (1) plaintiff improperly created diversity jurisdiction via a

22   collusive or "sham" assignment of a corporation's claims against defendants; and (2) the

23   otherwise proper plaintiff, Midwest Demolition Company of CA, Inc., which defendants assert is

24   the assignor of the chose in action, is a California corporation that has failed to appear through

25

26        [1]  This case proceeds before the undersigned pursuant to Eastern District of California
     Local Rule 302(c)(21) and 28 U.S.C. § 636(b)(1).

1

1  counsel.

2         On June 30, 2011, after defendants' motion was fully briefed, the undersigned

3  conducted an evidentiary hearing solely concerning the matter of subject matter jurisdiction,

4  which lasted nearly five hours.[2]  (See Minutes, June 30, 2011, Dkt. No. 53.)  The evidentiary

5  hearing did not touch on the merits of plaintiff's underlying claims.  Plaintiff John Zapata and

6  Greg Margritz, the President of Midwest Demolition Company of CA, Inc., testified at the

7  evidentiary hearing.  Additionally, the parties stipulated to the admission into evidence of all of

8  plaintiff's and defendants' respective exhibits.  Plaintiff's exhibits numbered 1 through 28 were

9  admitted into evidence.  Defendants' exhibits numbered 1 through 32 were also admitted into

10  evidence.  Unless otherwise noted, all citations in these findings and recommendations to

11  plaintiff's and defendants' exhibits refer to the exhibits admitted at the evidentiary hearing.

12         The court has fully reviewed the parties' submissions, the testimony provided at

13  the evidentiary hearing, and the appropriate portions of the record in this case.  For the reasons

14  stated below, the undersigned recommends that defendants' motion to dismiss be granted and

15  that plaintiff's action be dismissed for lack of subject matter jurisdiction pursuant to Federal Rule

16  of Civil Procedure 12(h)(3).  In short, the undersigned concludes that Midwest Demolition

17  Company of CA, Inc.'s assignment to plaintiff of its claims against defendants was collusive

18  within the meaning of the federal anti-collusion statute, 28 U.S.C. § 1359, and the law of this

19  Circuit.  As a result, Midwest Demolition Company of CA, Inc. is the proper plaintiff in this

20  action, and its presence in the action destroys complete diversity of the parties and deprives this

21  court of federal subject matter jurisdiction over the claims alleged in the complaint.

22  ////

23  ////

24

25         [2]  See, e.g., Augustine v. United States, 704 F.2d 1074, 1077 (9th Cir. 1983) ("In ruling
on a challenge to subject matter jurisdiction, the district court is ordinarily free to hear evidence
regarding jurisdiction and to rule on that issue prior to trial, resolving factual disputes where

26  necessary.").

I.      BACKGROUND

    A.      Plaintiff's Complaint[3]

On December 23, 2009, plaintiff filed the complaint in this action, alleging two claims for relief: (1) "breach of duty not to substitute subcontractor for listed subcontractor without proper consent," which is alleged against defendant Flintco, Inc. (see Compl. ¶¶ 12-23, Dkt. No. 1); and (2) violation of due process, alleged against defendant San Joaquin Delta Community College District (see id. ¶¶ 24-36).

Plaintiff filed this action as John Zapata, doing business as Zapata Collection Service, "an individual residing in Lancaster County, Nebraska" and "the assignee of all rights, title, [and] interest due to Midwest Demolition Company of California . . . , a California corporation, and against all Defendants."[4]  (Compl. ¶¶ 4-6.)  The named defendants are Flintco, Inc., an Oklahoma corporation ("Flintco"), and San Joaquin Delta Community College, a political subdivision of the state of California ("the District").  (Id. ¶¶ 8-9.)  Plaintiff alleges that this court has subject matter jurisdiction over this action pursuant to the diversity jurisdiction statute, 28 U.S.C. § 1332.  (Compl. ¶¶ 1-2.)  More specifically, plaintiff alleges complete diversity of citizenship among the parties and seeks damages in the amount of $348,031.  (See id. ¶¶ 2, 23, 36, and prayer for relief.)

Plaintiff's complaint alleges that on or about August 1, 2008, the District "called for competitive bidding for the construction of a public project consisting of the renovation of the interior of the Goleman Learning Resources Center," referred to herein as the "Project."  (Compl. ¶ 13.)  Midwest Demolition Company of California CA, Inc. ("MDC California") subsequently

_____

[3]  The factual recitation in this subsection I.A is based exclusively on the allegations in plaintiff's complaint and the exhibit thereto.

[4]  The complaint further states: "For simplicity, Plaintiff John Zapata d/b/a Zapata Collection Service and Midwest Demolition Company of California . . . will be referred collectively as Plaintiff."  (Compl. ¶ 7.)  Plaintiff expressly refers to Midwest Demolition Company of California CA, Inc. as a plaintiff in this action in at least one paragraph of the complaint.  (See id. ¶ 15 (referring to "Plaintiff Midwest").)

1  "submitted a subcontract bid to furnish labor and equipment to complete all of the interior

2  service selective demolition" for the Project.  (Id. ¶ 14.)  This bid, totaling $280,531.00, was

3  signed by "John Zapata . . . Midwest Demolition Co. of CA."[5]  (Ex. 1 to Compl., Dkt. No. 4.)

4  Flintco subsequently submitted a bid to the District to serve as the prime contractor for the

5  Project; Flintco's bid listed MDC California as the subcontractor for the interior service selective

6  demolition.  (Id. ¶ 15.)  The District ultimately accepted Flintco's bid.  (Id. ¶ 16.)

7          Plaintiff's first claim for relief is alleged against Flintco.  Plaintiff alleges that on

8  or about January 12, 2009, Flintco requested permission from the District to substitute another

9  subcontractor for MDC California in regards to the performance of the demolition work for the

10  Project. (Compl. ¶ 17.)  He further alleges that the District subsequently held a hearing on

11  Flintco's request and, in or around June 2009, determined that Flintco had not met the

12  requirements for the requested substitution under the California Public Contract Code.  (See id.

13  ¶ 19.)  Plaintiff alleges that despite MDC California's readiness to complete the work, Flintco

14  "wrongfully refused, and continues to refuse, to permit plaintiff to carry out such work."  (Id.

15  ¶ 21.)  Plaintiff alleges that the replacement of MDC California violated provisions of the

16  California Public Contract Code.

17          Plaintiff's second claim for relief is alleged against the District.  Plaintiff alleges,

18  in essence, that the District violated his right to "due process" because: (1) "the District was

19  aware that [MDC California] was the party required to perform the selective demolition, yet the

20  district allowed Flintco to violate section 4104 of the Public Contract Code" (Compl. ¶ 30);

21  (2) "the District [did not] make any attempt to prevent Flintco from performing the work that

22  [MDC California] was required to do on the project" (id. ¶ 31); and (3) "the district intentionally

23  and negligently delayed the substitute hearing process until such a time the [sic] Flintco was

24  _____

25      [5]  The bid submitted by MDC California is referred to as Exhibit 1 in plaintiff's
complaint.  (Compl. ¶ 14.)  Plaintiff inadvertently failed to attach Exhibit 1 to his complaint, but
26  subsequently filed Exhibit 1 with the court.

4

1  complete or nearly complete with all the demolition work that was required to be performed by

2  [MDC California]" (id. ¶ 33).[6]

3       B.    The Assignment From MDC California to Plaintiff

4       A document entitled "Assignment of Claims" between MDC California and

5  plaintiff ("Assignment") is central to the question of the court's subject matter jurisdiction.  (Pl.'s

6  Ex. 26.)  The Assignment is discussed in more detail below, but is also briefly described here.

7       The one-page Assignment concerns the "Project" referred to as "Goleman

8  Learning Resources Center" and provides, in part, that MDC California "does hereby assign,

9  acquit, bargain, and sell to John Zapata d/b/a Zapata Collection Services ("Assignee") all of its

10  claims, rights, damages, actions, grievances, and causes of action of any kind or character,

11  specifically including claims for violations of the California Subletting and Subcontracting Fair

12  Practices Act, which arise from, or related [sic] to, the above-referenced Project."  (Pl.'s Ex. 26.)

13  The Assignment is fairly characterized as purporting to effectuate a complete assignment of

14  MDC California's claims against defendants to plaintiff.

15       The Assignment is executed by Katie Cedarburg before a notary public in

16  Nebraska on June 15, 2009.  (Pl.'s Ex. 26.)  Ms. Cedarburg signed the Assignment as "V.P." of

17  "Midwest Demolition Company of California."  (Id.; see also Cedarburg Decl., Jan. 19, 2011,

18  ¶ 3, Defs.' Ex. 28.)  Ms. Cedarburg is plaintiff's daughter.  (Cedarburg Decl., May 29, 2011, at 2,

19  Pl.'s Ex. 25.)  The Assignment is not signed by plaintiff.

20       No amount of consideration is reflected in the Assignment.  Instead, the

21  Assignment provides: "Such assignment is for good and valuable consideration from Assignee to

22  the undersigned, the receipt and sufficiency of which is hereby acknowledged by the

23

24     [6] Although plaintiff's claim for relief against the District is labeled as a "due process" claim, plaintiff is not alleging a federal constitutional violation pursuant to 42 U.S.C. § 1983. Instead, plaintiff alleges that the District violated statutory protection provided by state law in the California Public Contract Code by holding the administrative hearing when it did.  (See Compl. ¶ 33.)  Plaintiff has never alleged or argued that this court has subject matter jurisdiction over his claims pursuant to 28 U.S.C. § 1331 or 28 U.S.C. § 1343.

5

1   undersigned." (Pl.'s Ex. 26.)  Plaintiff has represented that he and MDC California intended the

2   consideration for the Assignment to be $80,000.  However, plaintiff has also represented that the

3   total consideration paid was $94,500.  (See also Cedarburg Decl., Jan. 19, 2011, ¶ 3 (stating that

4   "Midwest has received $94,500 in valuable consideration from Mr. Zapata for the assignment").)

5   As explained below, the undersigned finds that regardless of the amount of consideration

6   suggested by plaintiff or Ms. Cedarburg, the relationship among the involved individuals and

7   entities, among other factors, supports a finding that the Assignment was collusive or a sham.

8        C.   Procedural History

9            As stated above, plaintiff filed his complaint on December 23, 2009.  Flintco filed

10  an answer to plaintiff's complaint on February 10, 2010, and the District filed an answer on

11  February 11, 2010.  (Dkt. Nos. 6, 8.)

12           On May 20, 2010, the undersigned conducted a status (pretrial scheduling)

13  conference in this case.  (Minutes, Dkt. No. 28; see also Order, May 21, 2010, Dkt. No. 29.)  In

14  the parties' Joint Status Report, defendants notified the court of their contentions that this court

15  might lack diversity jurisdiction over plaintiff's claims and that plaintiff, a non-lawyer, could not

16  appear on behalf of the proper plaintiff in this case, MDC California.  (See Joint Status Report

17  at 2, Dkt. No. 24.)  Specifically, defendants alleged that the assignment from MDC California to

18  plaintiff was a "sham" and ineffective to create diversity jurisdiction; MDC California, a

19  California corporation, is the appropriate plaintiff; and there can be no complete diversity if

20  MDC California is the proper plaintiff because the District is also a California entity.  (See id.

21  at 2:17-22.)

22           Following the scheduling conference, the undersigned entered an order:

23  (1) permitting defendants to conduct limited discovery and a limited deposition of plaintiff

24  confined to the issue of the court's subject matter jurisdiction; and (2) setting a briefing schedule

25  for defendants' motion, if any, regarding the issues raised in the Joint Status Report.  (See Order,

26  May 21, 2010, at 3-5.)  The undersigned set a special schedule to accommodate plaintiff, who

6

1    informed the court that he would be out of the country and unavailable from approximately June

2    18, 2010, through the middle of August of 2010.  (Id. at 3.)  Despite this accommodation,

3    discovery disputes arose wherein defendants credibly contended that plaintiff's obstreperous

4    behavior precluded compliance with the court's May 20, 2010 order.  Indeed, the undersigned

5    nearly recommended that plaintiff's case be dismissed pursuant to Federal Rule of Civil

6    Procedure 41(b) based on plaintiff's failure to prosecute this action and repeated failures to

7    follow the court's orders.  (See Order to Show Cause, Sept. 9, 2010, Dkt. No. 32; Order, Oct. 5,

8    2010, Dkt. No. 36.)  Moreover, plaintiff did not return from his international trip until late

9    September 2010, and did not notify the court of his return until he was under the threat of

10   sanctions including dismissal.  (See Letter, Sept. 28, 2010, Dkt. No. 35.)  The undersigned

11   ultimately modified the discovery and briefing schedules.  (See Order, June 10, 2010, Dkt.

12   No. 31; Order, Oct. 5, 2010.)

13          Defendants were finally able to take plaintiff's deposition on October 13, 2010,[7]

14   and filed a timely motion to dismiss.  In their motion, defendants challenge plaintiff's claim that

15   this court may exercise diversity jurisdiction over plaintiff's claims.  The undersigned construes

16   this motion as one proceeding under Federal Rule of Civil Procedure 12(h)(3).[8]  After being

17   granted an extension of time to oppose defendants' motion, plaintiff filed a written opposition.

18   As noted above, the undersigned conducted an evidentiary hearing regarding the issue of subject

19   matter jurisdiction on June 30, 2011.

20   ////

21   ////

22

23          [7] The transcript of plaintiff's October 13, 2010 deposition was admitted into evidence at
     the evidentiary hearing as defendants' Exhibit 27.

24

25          [8] See Augustine, 704 F.2d at 1075 n.3 (characterizing a post-answer motion brought
     pursuant to Rule 12(b)(1) as "technically untimely," but concluding that the government's
     motion was properly before the court as a 12(h)(3) "suggestion of lack of subject matter
26   jurisdiction").

II.    EVIDENTIARY OBJECTIONS

In his briefing in opposition to the pending motion, plaintiff objected to four exhibits appended to one of the declarations filed by defendants' counsel.  (Pl.'s Objections, Dkt. No. 49; see also Suh Decl., Exs. 1-4, Feb. 4, 2011, Dkt. No 47.)  The undersigned overrules plaintiff's objections on the grounds that they are moot.  Three of the exhibits that plaintiff objected to—exhibits 1, 2, and 4—were offered as evidence at the evidentiary hearing, and plaintiff stipulated to the admission of that evidence.  (See Defs.' Exhibits 18, 31, and 32.)  As to the remaining exhibit, exhibit 3 to the subject declaration, the court has not considered plaintiff's public Facebook profile page in resolving the pending motion.

III.   LEGAL STANDARDS

A.     Motion to Dismiss For Lack of Subject Matter Jurisdiction

A motion to dismiss brought pursuant to Federal Rules of Civil Procedure 12(b)(1) or 12(h)(3) challenges the court's subject matter jurisdiction.  Federal courts are courts of limited jurisdiction that "may not grant relief absent a constitutional or valid statutory grant of jurisdiction," and "[a] federal court is presumed to lack jurisdiction in a particular case unless the contrary affirmatively appears."  A-Z Int'l v. Phillips, 323 F.3d 1141, 1145 (9th Cir. 2003) (citations and quotation marks omitted); accord Kokkonen v. Guardian Life Ins. Co. of Am., 511 U.S. 375, 377 (1994); see also Fed. R. Civ. P. 12(h)(3) ("If the court determines at any time that it lacks subject matter jurisdiction, the court must dismiss the action.").

A motion to dismiss challenging the court's subject matter jurisdiction can be either "facial" or "factual" in nature.[9]  See, e.g., White v. Lee, 227 F.3d 1214, 1242 (9th Cir. 2000).  Where, as here, a defendant makes a factual challenge to the truth of plaintiff's

_____

[9]  The Ninth Circuit Court of Appeals has explained the difference between a facial and factual attack as follows: "'In a facial attack, the challenger asserts that the allegations contained in a complaint are insufficient on their face to invoke federal jurisdiction.  By contrast, in a factual attack, the challenger disputes the truth of the allegations that, by themselves, would otherwise invoke federal jurisdiction.'"  Wolfe v. Strankman, 392 F.3d 358, 362 (9th Cir. 2004) (quoting Safe Air for Everyone v. Meyer, 373 F.3d 1035, 1039 (9th Cir. 2004)).

1   allegations concerning the existence of federal subject matter jurisdiction, "the district court may

2   review evidence beyond the complaint without converting the motion to dismiss into a motion

3   for summary judgment." Safe Air for Everyone, 373 F.3d at 1039; accord White, 227 F.3d

4   at 1242.  Moreover, the court "need not presume the truthfulness of the plaintiff's allegations."

5   Safe Air for Everyone, 373 F.3d at 1039 (citing White, 227 F.3d at 1242).

6          "When subject matter jurisdiction is challenged under Federal Rule of

7   Procedure 12(b)(1), the plaintiff has the burden of proving jurisdiction in order to survive the

8   motion." Tosco Corp. v. Cmtys. for a Better Env't., 236 F.3d 495, 499 (9th Cir. 2001) (per

9   curiam), abrogated on other grounds by Hertz Corp v. Friend, 130 S. Ct. 1181 (2010); see also

10  Colwell v. Dep't of Health & Human Servs., 558 F.3d 1112, 1121 (9th Cir. 2009).  "Once the

11  moving party has converted the motion to dismiss into a factual motion by presenting affidavits

12  or other evidence properly brought before the court, the party opposing the motion must furnish

13  affidavits or other evidence necessary to satisfy its burden of establishing subject matter

14  jurisdiction." Safe Air for Everyone, 373 F.3d at 1039.

15          B.      The Federal Anti-Collusion Statute, 28 U.S.C. § 1359

16          Relevant to plaintiff's allegations regarding subject matter jurisdiction, district

17  courts have diversity jurisdiction over "all civil actions where the matter in controversy exceeds

18  the sum or value of $75,000, exclusive of interest and costs," and the action is between:

19  "(1) citizens of different States; (2) citizens of a State and citizens or subjects of a foreign state;

20  (3) citizens of different States and in which citizens or subjects of a foreign state are additional

21  parties; and (4) a foreign state . . . as plaintiff and citizens of a State or of different States." 28

22  U.S.C. § 1332; see also Airlines Reporting Corp. v. S & N Travel, Inc., 58 F.3d 857, 861 (2d Cir.

23  1995) (citing Strawbridge v. Curtiss, 7 U.S. (3 Cranch) 267, 2 L. Ed. 435 (1806)).  The United

24  States Supreme Court has "established that the 'citizens' upon whose diversity a plaintiff

25  grounds jurisdiction must be real and substantial parties to the controversy." Navarro Sav. Ass'n

26  v. Lee, 446 U.S. 458, 461 (1980).

1          A district court is deprived of subject matter jurisdiction when the conditions of

2  28 U.S.C. § 1359, also referred to as the federal anti-collusion statute, are met.  See, e.g., W.

3  Farm Credit Bank v. Hamakua Sugar Co., Inc., 841 F. Supp 976, 980 (D. Haw. 1994), aff'd,

4  87 F.3d 1326 (9th Cir. 1996).  Section 1359 provides: "A district court shall not have jurisdiction

5  of a civil action in which any party, by assignment or otherwise, has been improperly or

6  collusively made or joined to invoke the jurisdiction of such court."  28 U.S.C. § 1359.  "The

7  federal anti-collusion statute is aimed at preventing parties from manufacturing diversity

8  jurisdiction to inappropriately channel ordinary business litigation into the federal courts."

9  Yokeno v. Mafnas, 973 F.2d 803, 809 (9th Cir. 1992) (citing Kramer v. Caribbean Mills, Inc.,

10  394 U.S. 823, 828-29 (1969)).  "[T]he statute is to be construed broadly to bar any agreement

11  whose primary aim is to concoct federal diversity jurisdiction."  Zee Med. Distrib. Ass'n v. Zee

12  Med., Inc., 23 F. Supp. 2d 1151, 1158 (N.D. Cal. 1998) (citing Airlines Reporting Corp., 58 F.3d

13  at 862).  "A party may not create diversity jurisdiction by the use of an improper or collusive

14  assignment," and "[t]he party asserting jurisdiction has the burden of proof."  Dweck v. Japan

15  CBM Corp., 877 F.2d 790, 792 (9th Cir. 1989).

16          In assessing the validity of an assignment, the Ninth Circuit Court of Appeals has

17  held that "[c]ertain kinds of diversity-creating assignments warrant particularly close scrutiny"

18  and are presumptively ineffective to create diversity jurisdiction.  See Yokeno, 973 F.2d at 809-

19  10; see also Nike, Inc. v. Comercial Iberica de Exclusivas Deportivas, S.A., 20 F.3d 987, 991

20  (9th Cir. 1994).  These diversity-creating assignments can include assignments between parent

21  companies and subsidiaries and those between corporations and their officers or directors, where

22  the close relationship between the assignor and assignee presents opportunities for collusion or

23  manipulation.  See Nike, Inc., 20 F.3d at 991-92 (applying presumption to an assignment from a

24  subsidiary to its parent corporation); Yokeno, 973 F.2d at 809-10 ("Assignments between parent

25  companies and subsidiaries, and assignments by corporations to their officers or directors are

26  presumptively ineffective to create diversity jurisdiction.") (citation and quotation marks

10

1  omitted); <u>Dweck</u>, 877 F.2d at 792 ("We think it proper that this presumption should be applied to

2  assignments between corporations and its officers or directors.  Otherwise, any employee or

3  officer of a corporation could sue based on an assignment from a corporation."); <u>see also</u>

4  <u>Attorneys Trust v. Videotape Computer Prods., Inc.</u>, 93 F.3d 593, 596-97 (9th Cir. 1996) (stating

5  that "even when there is a complete assignment, collusion may be found," which is "most likely

6  to be where there is an excellent opportunity for manipulation, as in transfers between

7  corporations and their subsidiaries or transfers to a shell corporation").  "To overcome this

8  presumption, the party asserting diversity must show a legitimate business reason for the

9  transfer." <u>Yokeno</u>, 973 F.2d at 810 ("Simply articulating a business reason is insufficient; the

10  burden of proof is with the party asserting diversity to establish that the reason is legitimate and

11  not pretextual."); <u>accord</u> <u>Dweck</u>, 877 F.2d at 792.

12        Although the Ninth Circuit Court of Appeals has recognized the unsettled nature

13  of the role that subjective "motive" plays in evaluating a diversity-creating assignment, <u>see</u>

14  <u>Attorneys Trust</u>, 93 F.3d at 596, it has nevertheless held that "evidence of a jurisdictional motive

15  for the assignment will heighten the presumption of collusion." <u>Nike, Inc.</u>, 20 F.3d at 992 (citing

16  <u>Yokeno</u>, 973 F.2d at 811).  In the case of a heightened presumption, "[s]imply showing a

17  colorable or plausible business reason for the assignment will no longer suffice.  The business

18  reason must be sufficiently compelling that the assignment would have been made absent the

19  purpose of gaining a federal forum." <u>Id.</u> (citing <u>Yokeno</u>, 973 F.2d at 811).

20  IV.   <u>WHETHER FEDERAL SUBJECT MATTER JURISDICTION EXISTS</u>

21        At the outset, the undersigned notes that if the Assignment is valid and given

22  effect, subject matter jurisdiction premised on 28 U.S.C. § 1332 would exist.  The alleged

23  amount in controversy far exceeds $75,000.  Additionally, there would be complete diversity

24  among plaintiff and defendants.  Plaintiff is a resident of the State of Nebraska.  Flintco is a

25  corporate citizen of the State of Oklahoma, and the District is a political subdivision of the State

26  of California.  There does not appear to be any dispute in this regard.

A.      The Assignment Is Presumptively Ineffective to Create Diversity Jurisdiction

Although the Assignment occurred between MDC California and plaintiff, it also implicates another corporate entity, MWE Services, Inc. ("MWE Services"), a Nebraska corporation that does business as "Midwest Demolition Company." MDC California is a "division" of MWE Services. The undersigned concludes that the relationship between MDC California and MWE Services and plaintiff's relationship with both corporate entities constitute relationships that present opportunities for collusion or manipulation and give rise to the presumption that the diversity-creating Assignment is ineffective to create diversity jurisdiction.

The relationship between MDC California and MWE Services has presented something of a mystery in this case because none of the persons produced on behalf of either entity, including the entities' officers, has been able or willing to precisely state the nature of that relationship. As discussed below, during the majority of the relevant period, plaintiff was CEO of MWE Services. Nevertheless, plaintiff has repeatedly claimed to be unaware of the actual, legal relationship between the two entities, e.g., parent-subsidiary, sister corporations, etc. It suffices to say, however, that the relationship is a close one. MWE Services has owned 60 percent of the stock in MDC California since February 7, 2008. (Pl.'s Ex. 12.) And although MDC California is a separate corporation, it is treated as a "division" of MWE Services.[10] (Zapata Depo. at 10:23-25, Defs.' Ex. 27; Cedarburg Decl., May 29, 2011, at 2.) Moreover, plaintiff's testimony and the record support that: (1) MDC California and MWE Services "keep one set of records" or "corporate books" (Cedarburg Decl., May 29, 2011, at 2; Zapata Depo. at 11:1-3); (2) MDC California and MWE Services use a shared accounting system and share a bank account (Zapata Depo. at 18:24-19:2); and (3) MWE Services prepared all contracting bids submitted by MDC California, including MDC California's demolition bid pertaining to the

---

[10]  Mr. Margritz testified at the evidentiary hearing that he believed MWE Services would receive a portion of any profits from the Project based on the shares of MDC California's stock owned by MWE Services, i.e., MWE Services stood to receive 60 percent of the profits from the Project.

1  Project (id. at 42:16-18).  The testimony of plaintiff and Greg Margritz, President of MDC

2  California, also support that MDC California is dependent on MWE Services for operating

3  capital.

4          Additionally, the parties' exhibits demonstrate the substantial overlap in the

5  ownership and management of MDC California and MWE Services, including at the time of the

6  Assignment.  Gregory Margritz is an employee, agent, or consultant of MWE Services, and is

7  also the President, a Director, and a 30 percent shareholder of MDC California.  (Pl.'s Exs. 4-5;

8  Cedarburg Decl., May 29, 2011, at 2; Defs.' Ex. 31.)  Katie Cedarburg, plaintiff's daughter, has

9  been a corporate Vice-President, Secretary, Director, and ten percent shareholder of MDC

10 California since at least February 7, 2008.  (Pl.'s Exs. 4, 6, 12; see also Cedarburg Decl., Jan. 19,

11 2011, ¶ 1, Defs.' Ex. 28.)  Plaintiff's testimony at the evidentiary hearing and an affidavit filed by

12 Ms. Cedarburg reflect that Ms. Cedarburg has reportedly served as the President of MWE

13 Services since January 1, 2007 (Cedarburg Decl., May 29, 2011, at 1), and the evidence offered

14 by plaintiff indicates that Ms. Cedarburg has officially held the positions of President, Secretary,

15 and Treasurer of MWE Services since at least August 6, 2008.[11]  (Pl.'s Exs. 21, 24, 25.)  Plaintiff

16 testified that he unilaterally decided to make Ms. Cedarburg, his daughter, the President of MWE

17 Services.  Plaintiff's daughter is also a majority stockholder of MWE Services.  (Cedarburg

18 Decl., May 29, 2011, at 2.)

19          The relationships between plaintiff and both MWE Services and MDC California

20 were and are very close.  As to MWE Services, plaintiff served as that corporation's President

21 from approximately 1978 until January 1, 2007, at which time plaintiff made his daughter

22 President.  (See Zapata Depo. at 14:21-15:5.)  Plaintiff testified at his deposition and at the

23 evidentiary hearing that when Ms. Cedarburg took over as President of MWE Services, a new

24 position of Chief Executive Officer of MWE Services was created and that plaintiff served as

25

26      [11]  Ms. Cedarburg also serves as Controller for MWE Services and "in charge of
    accounting."  (Cedarburg Decl., May 12, 2010, Defs.' Ex. 18.)

CEO until his purported retirement from MWE Services at some point in 2010.[12]   (Id. at 14:17-25, 45:2-5; see also Defs.' Ex. 2 (Cert. of Revival or Renewal of Domestic Corporations filed on behalf of MWE Services on June 10, 2008, and signed by "CEO John Zapata").)   Plaintiff's actual date of retirement from MWE Services is unclear.   Plaintiff testified at his deposition that he was MWE Services's CEO until approximately April 2010.   (See Zapata Depo. at 9:18-25, 45:19-22.)   However, plaintiff's responses to interrogatories in an unrelated arbitration proceeding involving MWE Services, which were dated November 22, 2010, state that plaintiff was CEO of MWE Services at that time.[13]   (See Defs.' Ex. 32 ¶ 1.)   At the evidentiary hearing, plaintiff testified that he ceased acting as CEO on January 1, 2010.   Regardless, plaintiff was acting as CEO of MWE Services at the time of the Assignment in June 2009.   (Zapata Depo. at 45:21-22 ("I was CEO of MWE at the time of the assignment . . . .").)[14]   Moreover, plaintiff testified that he presently has check-writing authority for MWE Services despite his supposed retirement and continues to write checks on behalf of MWE Services.   Plaintiff submitted copies of MWE Services's bank statements and checks, through December 31, 2010, which reflect that plaintiff consistently wrote checks on behalf of MWE Services throughout the year 2010, and as

---

[12]   However, contrary to plaintiff's and Ms. Cedarburg's representations that plaintiff was replaced as President of MWE Services on January 1, 2007, evidence offered by defendants indicates that on June 10, 2008, MWE Services filed a corporate document with the Nebraska Secretary of State listing John Zapata as the President, Secretary, Treasurer, and Registered Agent for MWE Services.   (Defs.' Ex. 3.)   This document is signed by "John Zapata CEO."   (Id.)   Other evidence in the record reflects that plaintiff served as a Director of MWE Services until June 8, 2009, and served as MWE Services's Registered Agent until May 18, 2009.   (Pl.'s Exs. 22-23.)

[13]   At the evidentiary hearing, plaintiff stated that he had tried to amend those interrogatory responses, but offered no evidence in support of that representation.   Additionally, plaintiff represented at the evidentiary hearing that he did not actually prepare those interrogatory responses, despite the fact that the response that listed plaintiff as CEO asked for the identities of the persons who prepared the responses.

[14]   Plaintiff attempted to correct page 45, line 21of his deposition to reflect that he "was NOT CEO of MWE" at the time of the assignment."   (See Deponent's Changes or Corrections, p. 70 of Zapata Depo., attached to courtesy copy submitted by defendants.)   Even aside from plaintiff's contradictory testimony, the record simply does not support plaintiff's contention that he was not the CEO of MWE Services at the time of the Assignment.

late as December 27, 2010.[15]  (See Pl.'s Ex. 28.)  Additionally, plaintiff was listed as the first

contact on MWE Services's corporate website as late as January 27, 2011.  (Suh Decl., Feb. 4,

2011, ¶ 10 & Ex. 4; see also Defs.' Ex. 31.)  Furthermore, plaintiff testified at the evidentiary

hearing that although he transferred his 81 percent stock interest in MWE Services to his

daughter in 2009, he still holds that stock "in his name" as a "security."[16]

In regards to MDC California, plaintiff testified at the evidentiary hearing that he

has never been an employee, officer, or director of MDC California, although plaintiff testified

that he frequently consults with his daughter, Katie Cedarburg, who is an officer, director, and

owner of MDC California.  The record nonetheless reflects that plaintiff has been thoroughly

involved in MDC California's business, and particularly the Project that underlies this litigation.

Additionally, plaintiff has held himself out as an executive of MDC California, or has at least

created the impression to others that he is or was an executive of MDC California.

Plaintiff prepared the demolition subcontracting bid for the Project and signed the

bid on behalf of "Midwest Demolition Co. of CA."  (Defs.' Ex. 1.)  Furthermore, on November 6,

2008, plaintiff lodged an e-mail protest of the proposed de-listing of MDC California with

defendants; plaintiff listed his title as "CEO . . . Midwest Demolition Company."  (Defs.' Ex. 4.)

Additionally, on February 20, 2009, the District held an administrative hearing regarding

Flintco's request to substitute another subcontractor for MDC California in regards to the Project,

and only plaintiff and MDC California's attorney appeared at the hearing on behalf of MDC

California.  (Defs.' Exs. 5-6.)  At the hearing, plaintiff testified as follows in regards to his

position at "Midwest Demolition":

> Q:    . . . I'd like you to introduce you -- your position with Midwest here.
> What is your role at Midwest Demolition?

---

[15]  The court's docket reflects that the filing fee associated with the filing of plaintiff's
complaint on December 23, 2009, was paid "fbo John Zapata by MWE Services, Inc."

[16]  Plaintiff testified that he still receives weekly payments from MWE Services in
exchange for his now-transferred stock.

1    A:    I'm the Chief Executive Officer.  I do all the pricing.  I don't do
     takeoffs, but I price every job that goes out of the office?
2
     Q:    Was that your role at the time that Midwest submitted its bid to
3    Flintco?

4    A:    Yes, it was.

5    Q:    Have you been employed by Midwest since the time that Midwest
     submitted its bid to Flintco to the present?
6
     A:    About 30 years.
7
     Q:    Okay.  Are you the person at Midwest that's in charge of this
8    particular bid and subcontract?

9    A:    I am.

10   (Defs.' Ex. 5, Admin. Tr. at 38:25-39:14)[17]  Moreover, in a December 11, 2008 e-mail from

11   plaintiff to a representative of Flintco, plaintiff states that a contract sent to "*our* office in San

12   Diego" was inaccurate (Ex. 10 to Defs.' Ex. 5 (emphasis added)); MDC California's only office

13   is located in San Diego, California.  And as discussed further below, during the period of

14   November 6, 2008, through April 22, 2009, plaintiff sent numerous pieces of correspondence to

15   one or both defendants on behalf of MDC California, and was the only MDC California

16   representative copied on correspondence from MDC California's attorney.  (See Defs.' Exs. 4-5 ,

17   8-15, 17.)

18            Upon consideration of the closely intertwined relationships among plaintiff, his

19   daughter, MDC California, and MWE Services described above, the undersigned comes to

20   alternative conclusions regarding the Assignment.  First, the record credibly supports that MDC

21   California made the Assignment to plaintiff as MDC California's chief executive, even if the title

22

23        [17]  Plaintiff has repeatedly attempted to correct or reform his assertion at the
     administrative hearing that he appeared as CEO of MDC California, relying on the ambiguity
     caused by the fact that both MDC California and MWE Services do business as "Midwest
24   Demolition Company."  Although the undersigned need not resolve the apparent ambiguity in
     plaintiff's testimony at the administrative hearing, it is rather unbelievable that plaintiff did not
25   realize that he was testifying on behalf of MDC California when he stated he was Chief
     Executive Officer—the demolition subcontracting bid that was at issue at the hearing, which
26   plaintiff prepared, was clearly MDC California's bid.

16

1    was not formalized.  Even if plaintiff was not MDC California's chief executive, plaintiff was

2    MDC California's agent, representative, and close consultant.  Alternatively, MDC California, a

3    division of MWE Services, made the Assignment to the CEO of MWE Services.  Thus, MDC

4    California assigned its claims against defendants to the corporation of which it is a "division,"

5    and which corporation is the 60% owner of MDC California.  Viewed differently still, MDC

6    California assigned its claims to an officer of a corporation of which it is a division.  Under any

7    of these findings, the relationships among the assignor and assignee present those excellent

8    opportunities for collusion and manipulation that give rise to the presumption that a diversity-

9    creating assignment is ineffective.  See Nike, Inc., 20 F.3d at 991-92 (applying presumption to an

10   assignment from a subsidiary to its parent corporation); Yokeno, 973 F.2d at 809-10 (recognizing

11   application of the presumption to assignments between parent corporations and subsidiaries and

12   assignments by corporations to their officers or directors); Dweck, 877 F.2d at 792 (holding that

13   the presumption should apply to assignments between corporations and their officers, directors,

14   and employees).  The presumption should apply even where there is no formal parent-subsidiary

15   relationship but where one company so controls the other so to foster potential for collusion or

16   manipulation.  See W. Farm Credit Bank, 841 F. Supp at 982 (concluding that although neither

17   the assignor nor assignee claimed that they were in a parent-subsidiary relationship or that either

18   entity is a corporate officer of the other entity, the presumption against the effectiveness of an

19   assignment applied because the "closeness of the relationship between Western Farm and HPCA

20   serves to increase the possibility of collusion between them and to compound the difficulty

21   encountered in detecting the real purpose of the assignment"); see also Prudential Oil Corp. v.

22   Phillips Petroleum Co., 546 F.2d 469, 475 (2d Cir. 1976) ("The scrutiny normally applied to

23   transfers or assignments of claims which have the effect of creating diversity must be doubled in

24   the case of assignments between related or affiliated corporations since common ownership or

25   the control by one of the other only serves to increase the possibility of collusion and compound

26   the difficulty encountered in detecting the real purpose of the assignment.").  The undersigned

17

1  turns next to the question of whether the presumption should be heightened as a result of

2  evidence of a so-called "jurisdictional motive" underlying the Assignment.

3         B.      <u>Evidence of A Jurisdictional Motive Exists and Heightens the Presumption</u>

4              As noted above, the Ninth Circuit Court of Appeals has held that "evidence of a

5  jurisdictional motive for [an] assignment will heighten the presumption of collusion." <u>Nike, Inc.</u>,

6  20 F.3d at 992 (citing <u>Yokeno</u>, 973 F.2d at 811).  The undersigned finds that such a jurisdictional

7  motive existed prior to the execution of the Assignment.  Accordingly, the presumption of

8  collusion and against the propriety of diversity jurisdiction is heightened.

9              Before addressing the evidence of a "jurisdictional motive" present in the record,

10 the undersigned notes that it is beyond dispute that this case involves nothing more than ordinary

11 business litigation and questions of California state law.  Absent the Assignment, no diversity

12 jurisdiction would exist here.  MDC California is a California corporation that possessed claims

13 against Flintco and the District.  To proceed against Flintco and the District, which is also a

14 California entity, MDC California would have had to initiate this lawsuit in a California state

15 court.  Therefore, only through the assignment of claims to plaintiff, a citizen of Nebraska, was

16 an action in this federal court, premised on diversity jurisdiction, possible.

17             Here, plaintiff's conduct prior to the execution of the Assignment in June 2009

18 affirmatively evidenced MDC California's desire to file a lawsuit and proceed in federal court.

19 In December 2008, Flintco formally requested that the District delist MDC California as the

20 subcontractor scheduled to perform the interior selective demolition for the Project, and MDC

21 California objected through its attorney.  (Defs.' Exs. 7-8.)  As discussed above, on February 20,

22 2009, the District held an administrative hearing regarding Flintco's request to substitute another

23 subcontractor for MDC California in regards to the Project.  (Defs.' Ex. 5.)  Plaintiff and MDC

24 California's counsel appeared at the hearing on behalf of MDC California.  (<u>Id.</u>)

25             On February 20, 2009, following the administrative hearing, MDC California's

26 attorney requested the "District's permission to access the Goleman Learning Center site . . . to

1  videotape the project site as it exists now so that the site may be documented should this matter

2  proceed to litigation." (Defs.' Ex. 10.) On February 23, 2009, MDC California's attorney

3  contacted Flintco's counsel by letter regarding a Project site inspection, requesting "immediate

4  access to videotape the Project site as it now exists so that the site may be documented should

5  this matter proceed to litigation." (Defs.' Ex. 11.) MDC California's counsel further warned

6  Flinctco and its counsel of their obligations not to "willfully suppress or destroy evidence relating

7  to Midwest Demolition's claim." (Id.) Both of these letters, which clearly were drafted in

8  anticipation of potential litigation, list only plaintiff "John Zapata" on the "cc:" line. (Defs.'

9  Exs. 10-11.)

10        Having not yet received a decision following the administrative hearing, *plaintiff*

11  directly contacted Maria G. Bernardino, Director of Purchasing for San Joaquin Delta College,

12  via e-mail regarding the status of the decision making process. At a minimum, these e-mail

13  communications occurred on March 18, 2009, March 30, 2009, and April 1, 2009.[18] (Defs.'

14  Exs. 12-16.) Plaintiff's e-mails dated April 1, 2009, and April 22, 2009, are instructive. In an

15  April 1, 2009 e-mail to Ms. Bernardino, plaintiff wrote: "I hope the district does the correct thing

16  otherwise they will be facing legal action for their part in this fiasco. . . . I hope the district the

17  [*sic*] does not underestimate my willingness to take this matter to court." (Defs.' Ex. 15.)

18  Additionally, on April 22, 2009, apparently after the District's board approved a resolution

19  regarding Flincto's substitution request, plaintiff sent another e-mail to Ms. Bernardino in which

20  plaintiff wrote: "We will also be doing our part to make sure that Flintco does not go unpunished.

21  *We will soon be filing suit in Federal District Court against Flintco*, filing a complaint with the

22  California Contractors Licensing Board." (Defs.' Ex. 17 (emphasis added).)

23        Plaintiff alleges in his complaint that in June 2009, the District made a

24  determination unfavorable to Flincto. (See Compl. ¶¶ 19, 32.) However, plaintiff took issue

25

26        [18]  On April 1, 2009, the District's counsel contacted MDC California's counsel, requesting that plaintiff not contact the District directly. (Defs.' Ex. 16.)

1   with the District's alleged unreasonable delay in issuing a decision, and that delay underlies

2   plaintiff's claim against the District.  (See id. ¶ 33 (alleging that the District "intentionally and or

3   negligently delayed the substitute hearing process until such a time the [*sic*] Flintco was complete

4   [*sic*] or nearly complete with all the demolition work to be performed by Midwest").)  On

5   June 15, 2009, in the same month that the District issued its decision, plaintiff's daughter

6   executed the Assignment on MCD California's behalf.  (Pl.'s Ex. 26.)

7           Plaintiff's and MDC California's counsel's letters and e-mails reflect that MDC

8   California anticipated litigation with Flintco as early as February 2009.  Plaintiff represented

9   MDC California at the administrative hearing and followed up with the District on MDC

10  California's behalf regarding the District's pending decision.  Moreover, in April 2009, plaintiff

11  threatened and gave notice of the filing of anticipated litigation against Flintco *in federal district*

12  *court.*  This conduct reflects that MDC California intended to seek a federal forum *prior* to the

13  June 2009 Assignment.  The record demonstrates, however, that the desire to name the District as

14  a defendant in any such litigation as a result of its alleged delay—until June 2009—in rendering a

15  decision would destroy complete diversity of the parties.  Thus, the June 15, 2009 Assignment

16  from MDC California, a California corporation, to plaintiff, a Nebraska citizen and MWE

17  Services's CEO, was critical to seeking relief in a federal court sitting in California.  Taking

18  these facts together, the undersigned concludes that the Assignment was motivated by the desire

19  to create diversity jurisdiction.[19]  Accordingly, application of the heightened presumption is

20  warranted in this case.  See Nike, 20 F.3d at 992 (applying the heightened presumption after

21  finding that the assignment was motivated, "at least in part to obtain a federal forum").

22      C.    Plaintiff Has Not Met His Burden to Overcome the Heightened Presumption

23           As noted above, where the heightened presumption against a valid assignment

24  applies, "[s]imply showing a colorable or plausible business reason for the assignment will no

25  _____

26  [19] As discussed below, the sham assignment was also undertaken so that MDC California would not be forced to retain an attorney to represent its interests in court.

1  longer suffice.  The business reason must be sufficiently compelling that the assignment would

2  have been made absent the purpose of gaining a federal forum."  Nike, Inc., 20 F.3d at 992

3  (citing Yokeno, 973 F.2d at 811).  The court considers several factors in determining whether the

4  party attempting to support the assignment has met his or her burden to demonstrate a sufficient

5  business purpose under the "totality of the circumstances."  See Yokeno, 973 F.2d at 810.  These

6  factors include: "(1) did the assignee have a prior interest in the item or was the assignment timed

7  to coincide with the commencement of litigation; (2) was any consideration given by the

8  assignee; (3) was there an admission that the motive was to create jurisdiction; (4) was the

9  assignment partial or complete; and (5) were there good business reasons for the assignment."

10  Dae Poong Co. v. Deiss, No. C-05-01470 RMW, 2005 WL 2000936, at *2 (N.D. Cal. Aug. 16,

11  2005) (unpublished) (citing Attorneys Trust, 93 F.3d at 595-96).  Also relevant in this inquiry are

12  factors such as the assignor's continued involvement in the litigation, the assignor's

13  contemplation of instituting a lawsuit prior to assignment, and the advantages of gaining a federal

14  forum.  See Yokeno, 973 F.2d at 810.

15          Here, plaintiff contends that MDC California made the Assignment for financial

16  reasons.  The reasons offered for the Assignment have not always been consistent.  In his written

17  opposition, plaintiff asserts that the "good business reason for the assignment is that Midwest

18  received $94,500 without the burden of litigation interrupting the company's business of

19  performing demolition work."  (Pl.'s Opp'n at 7:1-3.)  Plaintiff relied on Ms. Cedarburg's

20  declaration, which represents that the MDC California executed the Assignment because MDC

21  California "receives an actual return of valuable monetary consideration without the burden of

22  litigation interrupting the company's focus in its business of performing demolition work."

23  (Cedarburg Decl., Jan. 19, 2011, ¶ 4.)  At the evidentiary hearing, Mr. Margritz testified that

24  although the Assignment was really Ms. Cedarburg's responsibility and that he had not actually

25  seen the Assignment, he believed that the Assignment was made so that MDC California could

26  receive cash for operating expenses.

1          The undesigned has considered all of the factors listed above, but concludes that

2    plaintiff has not met his burden to overcome the heightened presumption that the Assignment

3    was ineffective.  The undersigned finds that under the totality of the circumstances, the business

4    reasons offered by plaintiff—avoidance of the burdens of litigation and MDC California's need

5    for operating capital—do not compel a conclusion that the Assignment would have been made

6    absent the purpose of gaining a federal forum.  Rather than address all of the factors here, the

7    undersigned highlights several reasons that drive the conclusion that plaintiff failed to rebut the

8    heightened presumption.

9          First, the undersigned finds it material that plaintiff, MWE Services, and MDC

10   California clearly contemplated instituting a lawsuit in federal court prior to execution of the

11   Assignment, and that the only way for MDC California to pursue its claims against defendants in

12   a federal district court in California was to assign its claims to a diverse plaintiff.  As recounted

13   in detail above, the record supports that MDC California contemplated pursuing litigation as

14   early as February 20, 2009, conveying as much to defendants.  The record also demonstrates that

15   plaintiff, acting on behalf of MDC California, expressly stating MDC California's intention to

16   pursue litigation in federal district court in April 2009, which was just two months prior to the

17   June 2009 execution of the Assignment.  Moreover, the record supports that the basis for MDC

18   California's claims against the District arose in June 2009, and that the Assignment was essential

19   to filing the complaint in federal district court because MDC California and the District are non-

20   diverse parties.  MDC California made the Assignment in the same month that it formed the

21   basis for its claims against a contemplated defendant that would destroy diversity jurisdiction.

22   Thus, the Assignment was contemplated as a means to restore complete diversity of the parties so

23   that MDC California could follow through on its threatened federal court litigation.

24          Second, the undersigned finds that there was a failure of adequate consideration in

25   support of the Assignment.  Plaintiff testified at his deposition that "the total purchase [price for

26   the Assignment] was supposed to be $80,000."  (Zapata Depo. at 24:1.)  However, plaintiff also

Case 2:09-cv-03555-GEB-KJN   Document 54   Filed 08/12/11   Page 23 of 29

testified that he actually overpaid for the Assignment in an amount of $94,500.  (See id. at 23:13-14 ("The total deposits from me for the assignment is 2009 was 15,000, and for 2010 it was 79,500.").)  Ms. Cedarburg's declaration further states that MDC California "has received $94,500 in valuable consideration from Mr. Zapata for the assignment." (Cedarburg Decl., Jan. 19, 2011.)  The record reflects that although plaintiff might have paid approximately $94,500 into an account shared by MDC California and MWE Services, plaintiff and entities controlled by plaintiff were compensated with large payments from that same account.  Charitably stated, this bank account more accurately reflects a repository for loans made by, and repaid to, plaintiff and undermines plaintiff's claims that he actually paid valuable consideration for the Assignment.[20]

        Plaintiff and MDC California had no set payment schedule or an agreement governing the timing of payments by plaintiff; instead, plaintiff purportedly paid MDC California for the Assignment "as they needed the money." (Zapata Depo. at 23:16-24:11.)  Plaintiff has testified that he paid installments for the Assignment into a bank account shared by MDC California and MWE Services.  (Id. at 24:14-17.)  These payments are reflected in a document entitled "Transactions by Account, admitted as plaintiff's Exhibit 7.  Although plaintiff had great difficulty discussing the payments at the evidentiary hearing, he was more sure during his deposition.  According to plaintiff, the first payment of $15,000 was made on July 7, 2009; the second payment of $20,500 was made on January 6, 2010; the third payment of $19,000 was made on January 21, 2010; and the final payments totaling $40,000, were made on March 4, 2010.[21]  (See id. at 20-23; see also Ledger, Pl.'s Ex. 7.)

---

[20]  In fact, at the evidentiary hearing, plaintiff could not explain why within days of paying money into the MWE Services account purportedly as an installment payment for the Assignment, virtually the same amount of money was paid out of the MWE Services account to plaintiff or one of the entities controlled by plaintiff.  (See Pl.'s Ex. 7.)

[21]  The record supports that plaintiff was still CEO of MWE Services when all of the payments were made.

1        The undersigned finds that stated payment of consideration is belied by the nature

2  of the transaction.  The Assignment resembles anything but an "arms-length" transaction.  For

3  example, plaintiff overpaid for the Assignment, and made payments on an intermittent basis, as

4  MDC California allegedly needed the money.  Rather than a legitimate business arrangement,

5  this arrangement resembles one where the CEO of one family corporation infused working

6  capital into two corporations in which he had an interest.  Moreover, plaintiff was repaid for his

7  infusions.  For example, between July 7, 2009, and January 11, 2010, plaintiff or entities

8  controlled by him, e.g., Rancho De Cadiz, made deposits into the shared bank account of MDC

9  California and MWE Services, and payments from that account went back to plaintiff and his

10  entities, zeroing out the balance in the account.  Nearly every deposit and withdrawal or payment

11  in and out of that account involves a payment by, and back to, plaintiff.  That trend continues

12  with some variation through April 2010.  All of these transactions render highly suspect the

13  actual consideration purportedly paid for the Assignment.[22]

14        Finally, the fact that the Assignment was purportedly complete does not save it.

15  Aside from the defects pertaining to the adequacy of the consideration exchanged for the

16  Assignment, the Ninth Circuit Court of Appeals has held that even an assignment that is

17  complete on its face can be collusive where there is an excellent opportunity for manipulation.

18  See Attorneys Trust, 93 F.3d at 596 (collecting cases and stating that "even when there is a

19  complete assignment, collusion may be found," and that is "most likely to be where there is an

20  excellent opportunity for manipulation").  As discussed above, the relationships among plaintiff,

21  Ms. Cedarburg, MDC California, and MWE Services presented excellent opportunities for

22  manipulation.  Accordingly, plaintiff's reliance on the asserted completeness of the

23  Assignment—which is suspect in any event—is of no weight here.

24

25        [22]  The undersigned's ruling herein is based on the documentary evidence and testimony
presented at the evidentiary hearing.  However, to the extent that the issues turn on any
credibility determinations, the undersigned did not find plaintiff and his selective lack of memory

26  and supporting information credible.

1      For these reasons, the undersigned concludes that plaintiff has not overcome the

2  heightened presumption against the effectiveness of the Assignment.  Thus, the undersigned

3  concludes that the Assignment was ineffective, that MDC California is the proper plaintiff, that

4  MDC California's presence in this action destroys complete diversity of the parties, and,

5  therefore, this court lacks diversity jurisdiction over plaintiff's claims pursuant to 28 U.S.C.

6  § 1359.  Accordingly, the undersigned recommends that this action be dismissed for lack of

7  federal subject matter jurisdiction.

8  V.      PLAINTIFF'S REPRESENTATION OF A CORPORATION

9      In addition to their argument that this court lacks subject matter jurisdiction,

10  defendants contend that if the Assignment is determined to be improper, then this action must be

11  dismissed because plaintiff, a non-attorney, cannot represent the real party in interest: MDC

12  California, a California corporation.[23]  Because the undersigned concluded above that this case is

13  subject to dismissal for lack of subject matter jurisdiction, the court need not reach this issue.

14  VI.     PLAINTIFF'S ALLEGATIONS OF BIAS OR PARTIALITY

15      Finally, the undersigned addresses plaintiff's allegations made during the

16  evidentiary hearing that the undersigned is biased against him.  Although plaintiff has not filed a

17  motion to disqualify the undersigned, the undersigned addresses plaintiff's allegations of bias or

18  partiality because plaintiff asserted bias or partiality as a "standing objection" at the evidentiary

19  hearing.  Plaintiff alleges that the undersigned is biased based on: (1) the undersigned's

20  statements in previously entered orders to the effect that plaintiff's international, recreational

21  travels, which lasted several months after plaintiff filed this action, and other behavior have

22  substantially delayed the progression of this case (see Order, June 10, 2010; Order to Show

23  Cause, Sept. 9, 2010; Order, Oct. 5, 2010; Order, Oct. 8, 2010, Dkt. No. 39; Order, Dec. 17,

24

25      [23] The undersigned notes that pursuant to this court's local rules, "[a] corporation or other entity may appear only by an attorney."  E. Dist. Local Rule 183(a); accord United States v. High Country Broad. Co., 3 F.3d 1244, 1245 (9th Cir. 1993) (per curiam) (stating that "[a] corporation

26  may appear in federal court only through licensed counsel").

1   2010, Dkt. No. 43; Order Apr. 28, 2011, Dkt. No. 50);[24] and (2) the manner in which the

2   undersigned questioned witnesses from the bench during the June 30, 2011 evidentiary hearing.

3   These bases for plaintiff's claims of bias solely relate to orders issued by the undersigned in this

4   case and the manner in which the evidentiary hearing was conducted.

5          Pursuant to 28 U.S.C. § 144, a party may file a "timely and sufficient affidavit"

6   seeking to preclude the assigned judge from presiding over the matter any further as a result of "a

7   personal bias or prejudice" as to a party in the action.  Section 144 provides, in its entirety:

8          Whenever a party to any proceeding in a district court makes and files a
           timely and sufficient affidavit that the judge before whom the matter is
9          pending has a personal bias or prejudice either against him or in favor of
           any adverse party, such judge shall proceed no further therein, but another
10         judge shall be assigned to hear such proceeding.

11         The affidavit shall state the facts and the reasons for the belief that bias or
           prejudice exists, and shall be filed not less than ten days before the
12         beginning of the term at which the proceeding is to be heard, or good
           cause shall be shown for failure to file it within such time.  A party may
13         file only one such affidavit in any case.  It shall be accompanied by a
           certificate of counsel of record stating that it is made in good faith.

14

15  28 U.S.C. § 144.

16         Additionally, a United States magistrate judge may disqualify himself or herself

17  for several reasons presented in 28 U.S.C. § 455.  For example, "[a]ny . . . magistrate judge of the

18  United States shall disqualify himself in any proceeding in which his impartiality might

19  reasonably be questioned."  28 U.S.C. § 455(a).  Moreover, a magistrate judge "shall also

20  disqualify himself [or herself] . . . [w]here he has a personal bias or prejudice concerning a party,

21  or personal knowledge of disputed evidentiary facts concerning the proceeding."  Id. § 455(b)(1).

22         The Ninth Circuit Court of Appeals has held that "[t]he substantive standard for

23  recusal under 28 U.S.C. § 144 and 28 U.S.C. § 455 is the same: '[W]hether a reasonable person

24

25         [24]  Although not dispositive of plaintiff's allegations of bias or partiality, plaintiff
    previously acknowledged in a response to an Order to Show Cause that his "travels have delayed
    the progression of this case temporarily," but stated that he was "not intentionally causing delay
26  to the case."  (Show Cause Aff. of John Zapata ¶ 5, Dkt. No. 33.)

1  with knowledge of all the facts would conclude that the judge's impartiality might reasonably be

2  questioned.'" United States v. Hernandez, 109 F.3d 1450, 1453-54 (9th Cir. 1997) (per curiam)

3  (quoting United States v. Studley, 783 F.2d 934, 939 (9th Cir. 1986)); accord Pesnell v.

4  Arsenault, 543 F.3d 1038, 1043 (9th Cir. 2008).

5          In United States v. Grinnell Corp., 384 U.S. 563 (1966), the United States

6  Supreme Court stated that in order for the "alleged bias and prejudice to be disqualifying" in the

7  context of a Section 144 affidavit, it must stem from an "extrajudicial source." Id. at 583.  In

8  Liteky v. United States, 510 U.S. 540 (1994), the Supreme Court extended the so-called

9  "extrajudicial source doctrine" to disqualifications pursuant to 28 U.S.C. § 455, but clarified that

10 the alleged bias must *usually* arise from an extrajudicial source.  See id. at 554-55 (stating that "it

11 would be better to speak of the existence of a significant (and often determinative) 'extrajudicial

12 source' factor, than of an 'extrajudicial source' doctrine, in recusal jurisprudence).  In so holding,

13 the Court explained:

14          First, judicial rulings alone almost never constitute a valid basis for a bias
           or partiality motion.  In and of themselves (*i.e.*, apart from surrounding
15          comments or accompanying opinion), they cannot possibly show reliance
           upon an extrajudicial source; and can only in the rarest circumstances
16          evidence the degree of favoritism or antagonism required (as discussed
           below) when no extrajudicial source is involved.  Almost invariably, they
17          are proper grounds for appeal, not for recusal.  Second, opinions formed
           by the judge on the basis of facts introduced or events occurring in the
18          course of the current proceedings, or of prior proceedings, do not
           constitute a basis for a bias or partiality motion unless they display a
19          deep-seated favoritism or antagonism that would make fair judgment
           impossible.  Thus, judicial remarks during the course of a trial that are
20          critical or disapproving of, or even hostile to, counsel, the parties, or their
           cases, ordinarily do not support a bias or partiality challenge.  They *may* do
21          so if they reveal an opinion that derives from an extrajudicial source; and
           they *will* do so if they reveal such a high degree of favoritism or
22          antagonism as to make fair judgment impossible.

23 Id. at 555 (citation omitted); see also United States v. Johnson, 610 F.3d 1138, 1147 (9th Cir.

24 2010) ("We have described the extrajudicial source factor as involving 'something other than

25 rulings, opinions formed or statements made by the judge during the course of trial.'") (quoting

26 United States v. Holland, 519 F.3d 909, 914 (9th Cir. 2008)).  "'[E]xpressions of impatience,

1  dissatisfaction, annoyance, and even anger' are not grounds for establishing bias or impartiality,

2  nor are a judge's efforts at courtroom administration."  Pesnell, 543 F.3d at 1044 (citing Liteky,

3  510 U.S. at 555-56).

4          Here, the extrajudicial source factor applies to plaintiff's allegations of bias or

5  partiality, and would foreclose a motion for disqualification filed by plaintiff pursuant to

6  28 U.S.C. §§ 144, 455.  Plaintiff has not identified any extrajudicial source that gives rise to his

7  claims that the undersigned is biased against him or otherwise acted in a partial manner in this

8  matter.  Instead, plaintiff's complaints stem entirely from the undersigned's judicial rulings and

9  questioning in plaintiff's case.  Thus, any request or motion for disqualification would be

10  squarely foreclosed by the Supreme Court's decision in Liteky and the Ninth Circuit Court of

11  Appeals's subsequent decisions that are in accord with Liteky.

12  VII.    CONCLUSION

13          For the reasons stated above, IT IS HEREBY RECOMMENDED that defendants'

14  motion to dismiss (Dkt. No. 41) be granted, and that plaintiff's action be dismissed for lack of

15  federal subject matter jurisdiction.

16          These findings and recommendations are submitted to the United States District

17  Judge assigned to the case, pursuant to the provisions of 28 U.S.C. § 636(b)(1).  Within fourteen

18  days after being served with these findings and recommendations, any party may file written

19  objections with the court and serve a copy on all parties.  Id.; see also E. Dist. Local Rule 304(b).

20  Such a document should be captioned "Objections to Magistrate Judge's Findings and

21  Recommendations."  Any response to the objections shall be filed with the court and served on

22  all parties within fourteen days after service of the objections.  E. Dist. Local Rule 304(d).

23  Failure to file objections within the specified time may waive the right to appeal the District

24  ////

25  ////

26  ////

1    Court's order.  <u>Turner v. Duncan</u>, 158 F.3d 449, 455 (9th Cir. 1998); <u>Martinez v. Ylst</u>, 951 F.2d

2    1153, 1156-57 (9th Cir. 1991).

3                    IT IS SO RECOMMENDED.

4    DATED:  August 11, 2011

5

6

7                                        KENDALL J. NEWMAN
                                         UNITED STATES MAGISTRATE JUDGE
8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26